# NEW YORK COMMON PLEAS.

ELIZABETH BURTON agt. CECILIA BURTON, and JOHN J.
CRANE, ex'trs, &c., of WILLIAM E. BURTON, deceased.

" Any woman being an *alien* who has heretofore married or who may hereafter
marry a citizen of the United States, shall be entitled to dower in the real estate
of her husband, within this state, as if she were a citizen of the United States."
(*Laws* 1845, *ch.* 115, § 3.)

" Any woman who might lawfully be naturalized under the existing laws, married
or who shall be married to a citizen of the United States, shall be deemed
and taken to be a citizen of the United States." (*Act of Congress Feb.* 10,
1855, 10 *Stat. at Large, p.* 604, § 2.)

Where the plaintiff, an *alien widow*, having married an alien prior to the passage
of the act of the legislature in 1845, and never having resided in this country
prior to her husband's death, *held*, that she had no *dower right* in the lands of
which her husband died seized as a citizen of the United States.

*Held*, also that the act of Congress of 1855, was designed for the benefit of an alien
white woman, whether resident or not, married to a person who was *at the time
of the marriage a citizen of the United States*. But if construed with liberality,
it would only extend to an alien woman *resident in this country*, though married
abroad to an alien, and who came to this country with him or followed him here,
and in that way, or in one of these ways identified herself with the country of
his adoption.

*New York Special Term, March,* 1864.

THE plaintiff by this action seeks to have her dower ad-
measured in the lands whereof William E. Burton died
seized in Hudson street, in the city of New York, whereon
Burton erected his residence, and in which he died. She
alleges in her complaint that the plaintiff and William E.
Burton were married at the church of the parish of St.
Martin-in-the-Fields, county of Middlesex, England, on the
10th day of April, 1823, and to bring the case within the
acts of congress in relation to the naturalization of aliens,
she having until after Burton's death remained in England,
embracing in her complaint the following allegation :

" That she then was, and ever since hath been and is a
free white woman."

She further alleges that William E. Burton died seized
and possessed of the property described in the complaint,

on the 10th day of February, 1860, having devised the same to the defendants in fee.

The defendants, by their answer, denied the marriage, and as a second defence set up the naturalization of Burton on the 8th day of October, 1840, in Pennsylvania; that the plaintiff was an alien, having, ever since the pretended marriage, been, and, still being, a subject of Great Britain; and, therefore, not entitled to dower in the lands of the testator.

To this second defence the plaintiff demurred, and the matter came up for hearing on this demurrer.

CHARLES O'CONOR and B. F. DUNNING, *for plaintiff.*
EDMUND R. ROBINSON, *for defendants.*

The counsel for the plaintiff argued that Burton, being a citizen of the United States on the 10th day of February, 1855, the plaintiff, as his wife, by force of the act of congress passed on that day, also became a citizen of the United States; that nothing in the act of 1802 could be construed as requiring an actual residence here; that by construction of law the plaintiff's residence at the time of the passage of the act was the same as that of her husband. He further claimed that, under the act of the legislature of this state, passed April 30, 1845, the plaintiff was entitled to recover the dower she sought.

The counsel for the defendants urged that the rule of the common law, that an alien was not entitled to be endowed of lands of her husband, whether he was a citizen or not, governed the case. That the plaintiff did not come within the act of congress of 1855, because until after the death of Burton, she never resided or came within the United States.

BRADY, J. In this case a question is presented, for the first time, which involves a construction of the second

section of the act of Congress, passed on the 10th February, 1855, which is as follows :

"Any woman who might lawfully be naturalized under the 'existing laws, married, or who shall be married to a citizen of the United States, shall be deemed and taken to be a citizen of the United States." (10 *Statutes at Large*, *p.* 604, § 2; *Brightley's Digest*, *p.* 132, § 2.)

The plaintiff was the wife of William E. Burton, now deceased. They were both born in the United Kingdom of Great Britain and Ireland. After their marriage, Mr. Burton came to this country and continued to be a resident thereof until his death. He was duly naturalized in the year 1840. The plaintiff continued to be a resident of her native land until after the death of her husband, when she came to this country, and in this action, under and by virtue of the act of congress referred to, claims a right of dower in the lands of which he died seized. The difficulties which present themselves in this case arise from the ambiguity of the section which has been recited. What is meant by the words "any woman who might lawfully be naturalized under the existing laws, married to a citizen of the United States ?" The rest of the section is free from obscurity. The language employed by the law givers would seem to extend the rights of citizenship to every woman married to a citizen of the United States, whether such marriage took place before or after the husband became a citizen, and whether the wife was or was not a resident of this country, either at the time of the marriage or subsequently.

Did the congress of the United States, enacting this law, intend that it should have such an effect ? We must, as suggested by Chief Justice TANEY, gather their intention from the language used, comparing it, where ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed (*Aldridge* agt. *Williams*, 3 *How. U. S. R.* 24),

and adopting that suggested as a guide, a conclusion may be drawn, which will remove the doubts and reveal the design of the act under consideration. The act itself was framed (see section first) in reference to the issue of citizens of this country born abroad.

Necessity for legislation on that subject undoubtedly provoked it. A very able review by Mr. Horace Binney of the acts of congress in force on that subject and of the various attempts to remedy the existing legal defects will be found in the second volume of the *American Law Register* (*Phil.*) *p.* 193, and I entertain the belief that the review mentioned contributed much to the enactment of the law. It will not be necessary for the determination of the question involved in this case, however, to consider in detail the whole scope of legislation upon the subject of citizenship of children born abroad whose parents were or whose father was a citizen of the United States, but to refer to it as incidental to the question on hand, the two subjects embraced in the act of 1855 being kindred to and growing out of each other. It will be sufficient, therefore, in relation to the subject embraced in the first section of the act of 1855 to say that under the then existing laws the child of a citizen of the United States born abroad was an alien, and that even under the act of congress passed in 1802 (*Brightley's Digest, p.* 35) the child of an alien mother born abroad was an alien although the father was in fact a citizen. Some attempts were made in congress to remedy this, and bills were introduced for that purpose. One reported by Mr. Wall in 1841, another introduced by Mr. Webster in 1848, and still another by Mr. Bradbury in 1852.

None of these bills were passed, however—they were unlike in phraseology or dissimilar in scope. The bill reported by Mr. Wall contained no express provision in reference to women. The bill of Mr. Webster provided that the children of citizens of the United States born out of

the limits of the United States should be considered as citizens of the United States, and also by the second section, " that every woman married, or who . should be married to a citizen of the United States, and should continue to reside therein, should be deemed and taken to be a citizen of the United States." The bill introduced by Mr. Bradbury was precisely the same as Mr. Webster's ; but the judiciary committee recommended that the second section should be stricken out. (*Review of Mr. Binney, supra; see, also, Congressional Globe, and Appendix, Second Session, Twenty-sixth Congress, pp.* 181–212 ; *Congressional Globe, First Session, Thirtieth Congress, p.* 834—*Mr. Webster's remarks, and p.* 844, *his bill ; Congressional Globe, Part Second, Twenty-fourth volume, First Session, Thirty-second Congress, pp.* 991–1352.) It will thus be seen that legislation in congress, so far as it extended to alien wives prior to the year 1855, contemplated a continued residence by them in this country, which was the effect of the provision in Mr. Webster's bill, and, as we have seen, the judiciary committee, at a subsequent period recommended that even the grant of that privilege should be discountenanced. The conditional qualification of continued residence by the wife may have been regarded as objectionable, because it was not imposed upon the husband, and his civil condition might continue, while hers would change.

But whether that was so or not, no substitute was suggested for that section by the committee. The assault upon it was sweeping. The act of 1855, therefore, as we glean from this previous legislation, though unfinished, the history of the legislative object to be attained by it, and as well the general considerations which influenced nations in framing naturalization laws, was designed, certainly, for the benefit of an alien white woman, whether resident or not, married to a person who was at the time of the marriage a citizen of the United States, thus securing, by the same law, the rights of citizenship to the children of

American citizens born abroad, and to such alien wife all legal rights of citizenship, which otherwise, and by reason of her alienism, she might not possess. (*See opinion of Judge Ingraham in case of Greer agt. Sankston, decided in the supreme court, first district, adopting a like construction upon similar phraseology in a kindred case.*)

This was, in my judgment, the primary object of the act if it be not the full scope of its intent. It was a legislative measure passed in reference to citizens of the United States, and bearing upon such marital relations with alien women as they might establish. Construed with liberality, however, it might be held, also, to extend to an alien woman resident in this country, though married abroad to an alien, and who came to this country with him or followed him here, and in that way, or in one of these ways, identified herself with the country of his adoption. Such a construction would produce an effect analogous to that of the statute which confers citizenship upon the alien minor children, dwelling in the United States, of a person who becomes a citizen. (*Act, Brightley's Digest, p. 35, § 3.*)

In this case, the plaintiff has neither sought to derive the benefit of her husband's naturalization by coming with or following him here, nor entitled herself to the benefit of a liberal construction in her favor of the act, as suggested, by a residence in this country of any duration prior to her husband's death. Her rights, therefore, as a citizen, depend entirely upon the construction of the section of the statute under consideration, and I am of the opinion that she has no claim upon her husband's estate thereunder. He was not, when he married her, a citizen of the United States, and she was never a resident thereof during his life. On the contrary, she was and continued to be both alien and stranger.

*Reported ante, p. 471.

The plaintiff being an alien, and having married an alien, and not having resided in this country prior to her husband's death, has no dower right in the lands of which her husband died seized, under the provisions of the act of the legislature, passed in 1845, (*Session Laws* 1845, *p*. 94.)

The precise point has been decided in the case of *Greer* agt. *Sankston, supra.* For these reasons, I think the defendants entitled to judgment upon the demurrer.

Ordered accordingly.